**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
Sean J. Kirby (N.J. Bar No. 27782006)
Lindsay Colvin Stone (*pro hac vice* forthcoming)
Ian Wahrenbrock (*pro hac vice* forthcoming)
Matthew Netti (*pro hac vice* forthcoming)
30 Rockefeller Plaza
New York, New York 10112
Telephone: 212-653-8700
Facsimile: 212-653-8701
skirby@sheppard.com
lstone@sheppard.com
iwahrenbrock@sheppard.com
mnetti@sheppard.com

*Attorneys for Plaintiffs H&U, Inc. dba Sun Noodle and Sun Noodle New Jersey, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| H&U, INC. dba SUN NOODLE and SUN NOODLE NEW JERSEY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>KOMOLO, INC., TBK HOLDING, MAKOTO SATO, and YASUHISA TANAKA,<br><br>Defendants. | Case No.: 26-cv-10454<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs H&U, Inc. dba Sun Noodle ("H&U") and Sun Noodle New Jersey, LLC ("SNNJ," and together with H&U, "Sun Noodle" or the "Company") by and through counsel Sheppard, Mullin, Richter & Hampton LLP, for their Complaint, allege against Defendants Komolo, Inc. ("Komolo"), TBK Holding ("TBK"),

Yasuhisa Tanaka ("Tanaka"), and Makoto Sato ("Sato," and together with Komolo, TBK and Tanaka, "Defendants") as follows:

## INTRODUCTION

1. This action arises from a brazen scheme by Defendants to misappropriate Sun Noodle's trade secrets and confidential information, including its famous Classic Noodle recipe and customer information, to unlawfully compete with Sun Noodle in the craft ramen market.

2. Founded in 1981, Sun Noodle creates premium, freshly made Japanese noodles, offering bespoke noodles to chefs seeking to create the perfectly unique bowl and restaurant-quality noodle experiences to consumers at home.

3. Since Sun Noodle's inception more than four decades ago, its Classic Noodle recipe has been the subject of ongoing development and refinement to ensure Sun Noodle's production of the most high-quality noodle products.

4. Sun Noodle fiercely guards the Classic Noodle recipe, and the customers to whom it sells its product, in Company-secured, password-protected databases accessible to only key personnel, and requiring every employee to acknowledge strict confidentiality obligations as a condition of employment, restricting the unauthorized use or disclosure of Sun Noodle recipes and customer information.

5. Defendants blew that vault door open. Just two months before resigning from the Company, Makoto Sato – a long-time employee in Sun Noodle's Research & Development department – accessed Sun Noodle's restricted recipe database and, without any legitimate business need, downloaded no fewer than 313 confidential files to his personal laptop, including files containing the Classic Noodle recipe. Less than two months later, Sato resigned from Sun Noodle to join Komolo, a distributor of food and food service products, and purchaser of Sun Noodle products.

6. One week after Sato's resignation, Defendant Tanaka, a former Sun Noodle Maintenance Manager who had left the Company in March 2025 to become Komolo's Factory Manager, sent Sato a spreadsheet titled "Ramen Purchase." That spreadsheet contained an unmistakable roadmap for how to replicate Sun Noodle's business, including the Classic Noodle recipe itself, Sun Noodle's confidential customer list, and a schematic for a noodle production facility. Critically, the spreadsheet contained refinements to the Classic Noodle recipe that post-dated Tanaka's resignation compelling the rational conclusion that Sato had unlawfully downloaded and shared the Classic Noodle recipe with Tanaka sometime between May and July 2026.

7. Upon information and belief, Komolo, with the knowledge and support of its parent company TBK, intends to unlawfully use Sun Noodle's stolen information to manufacture its own noodle products and sell them to Sun Noodle's

own customers, thereby eliminating Komolo's need to purchase noodles from Sun Noodle.

8. When confronted, Defendants' counsel confirmed critical elements of this scheme, including that Sato was employed by Komolo, that Tanaka possessed the spreadsheet, and that the spreadsheet contained Sun Noodle's confidential Classic Noodle recipe. Incredibly, however, Defendants have refused to provide any explanation for their conduct.

9. Sun Noodle accordingly brings this action to stop Defendants' ongoing and threatened misappropriation of its trade secrets and confidential information, recover the damages Defendants' misconduct has caused and will continue to cause, and prevent Defendants from using Sun Noodle's crown-jewel recipe and customer relationships to compete against the Company that built them.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Sun Noodle asserts a cause of action under federal law pursuant to the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. The Court has subject matter jurisdiction over Sun Noodle’s additional claims pursuant to 28 U.S.C. § 1367.

11. This Court has authority to provide temporary and preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65.

12. Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in New Jersey.

**THE PARTIES**

13. Plaintiff H&U is incorporated in Hawaii with a principal place of business in Honolulu, Hawaii. H&U maintains production facilities in Hawaii, California, New Jersey, and the Netherlands.

14. Plaintiff SNNJ is a wholly-owned subsidiary of H&U, Inc. and maintains a principal place of business in Carlstadt, New Jersey.

15. Defendant Komolo, Inc. is incorporated in Maryland and is headquartered in Jessup, Maryland. In addition to operating in Maryland, Komolo maintains a product factory in and conducts business in New Jersey.

16. Defendant TBK Holding is a private company with a principal place of business in Ridgefield, New Jersey.

17. Defendant Yasuhisa Tanaka is a natural person, former employee of Sun Noodle, and current employee of Komolo. Upon information and belief, Tanaka resides at 20-22 1st Street, Unit 2, North Arlington, New Jersey 07031.

18. Defendant Makoto Sato is a natural person, former employee of Sun Noodle, and current employee of Komolo. Upon information and belief, Sato resides at 101 Van Buren Avenue, Teaneck, New Jersey 07666.

## FACTUAL ALLEGATIONS

### A. Sun Noodle's Ramen Business

19. Sun Noodle creates premium, freshly made Japanese noodles and ingredients, offering bespoke noodles to chefs seeking to create the perfectly unique bowl and restaurant-quality noodle experiences to consumers at home.

20. H&U was founded in Hawaii in 1981 by Hidehito Uki ("Hidehito"), who emigrated to the United States from Japan's Tochigi prefecture. Hidehito created Sun Noodle alongside his wife Keiko by traveling door to door, offering fresh noodle samples to local chefs.

21. Sun Noodle started as a family business in Hawaii and as Sun Noodle grew, it maintained the spirit of `ohana (family), which has become embodied in its corporate identity and culture.

22. Under the stewardship of Hidehito and Keiko's children, Kenshiro Uki ("Kenshiro") and Hisae Uki, Sun Noodle has since expanded beyond Hawaii to California, New Jersey, and the Netherlands, and to encompass subsidiaries including SNNJ.

23. Sun Noodle primarily generates revenue by manufacturing and distributing noodles to chefs, restaurants, and food service providers worldwide. As part of that business, the Company collaborates with some of the top chefs and

restaurants in the United States – including Momofuku, Ivan Ramen, and Tsujita Artisan Noodle – to create customized recipes to suit their needs.

24. Sun Noodle has also expanded to sell its own retail products to major chains like Whole Foods, Target, Wegmans, and H-Mart.

25. Sun Noodle is the market share leader by volume and revenue in the small and highly competitive craft ramen sector, which consists, at most, of six companies.

26. While ramen remains the core of its business, Sun Noodle also manufactures a variety of other noodle products, including tsukemen, yakisoba, mazemen, and other regional noodles.

27. Sun Noodle's most important and profitable recipe is its secret "Classic Noodle" recipe, which serves as the base for approximately twenty of its products and generates millions of dollars in revenue per year for the Company. Originally created by Hidehito in 1981, the Classic Noodle recipe has been the subject of ongoing development and refinement over the ensuing forty-five years to ensure Sun Noodle's production of the most high-quality products.

28. The Classic Noodle recipe, like all of Sun Noodle's other recipes, is proprietary, fiercely guarded, and stored only in a Company-secured and password-protected SharePoint database.

29. Only a select number of Sun Noodle employees have access to the SharePoint subfolder that contains Sun Noodle's Classic Noodle recipe and Sun Noodle limits access to the SharePoint folder containing Sun Noodle's Classic Noodle recipe to employees whose duties and responsibilities require them to view Sun Noodle's recipe information.

30. To gain access to the folders containing Sun Noodle's recipe information, including the Classic Noodle recipe, an employee's manager, in connection with Sun Noodle's Human Resources, must request access.

31. Sun Noodle employees who are authorized to view Sun Noodle's recipe information, including the Classic Noodle recipe, may only access the recipe information through their password protected, Company-issued laptops or on their personal devices, which require an employee to use their Company credentials (username and password) through Microsoft 365, and complete a two-factor authentication system.

32. Sun Noodle implements these security measures to prevent unauthorized access to the subfolder containing the Classic Noodle recipe.

33. Sun Noodle also maintains the secrecy of its confidential customer lists by maintaining such information on its Company-secured Microsoft Enterprise Resource Planning ("ERP") system, which only certain employees in designated departments have access to.

34. Like the secured SharePoint folders containing Sun Noodle's recipe information, the ERP system is limited to Sun Noodle employees whose managers, in connection with Human Resources, have requested permission for access.

35. Like the secured SharePoint folders containing Sun Noodle's recipe information, employees who are authorized to view Sun Noodle's customer lists on the ERP, may only access the ERP through their password protected, Company-issued laptops or on their personal devices, which require an employee to use their Company credentials (username and password) through Microsoft 365, and complete a two-factor authentication system.

36. Sun Noodle implements these security measures to prevent unauthorized access to the ERP system and Sun Noodle's confidential customer lists.

**B. Komolo and TBK**

37. Komolo is a Maryland-based importer, processor, and distributor of a wide variety of food and food service products, marketing itself as providing "everything from seafood to chopsticks."

38. Komolo, in turn, is owned by TBK, a New Jersey-based company that operates the sushi franchise Sushi Maru Express, the ramen franchise RamenYa, and the retail distributor Foodie Craft International alongside Komolo.

39. Komolo first became a customer of Sun Noodle in 2017.

40. In 2021, Sun Noodle began selling noodle products to Pora Foods, a ramen shop in the American Dream Mall in Secaucus, New Jersey that is operated by RamenYa.

41. Between 2017 and 2026, Komolo (together with its affiliates) has purchased over $1 million worth of noodles from the Company.

42. Upon information and belief, Komolo, with TBK's knowledge, is planning to manufacture its own noodles using Sun Noodle's recipe, and sell that in-house product to its customers, thereby avoiding the need to purchase high-quality noodles from a third party.

## C. Tanaka's Employment with Sun Noodle

43. Tanaka joined SNNJ on or about February 6, 2017 in the role of Maintenance Manager at Sun Noodle's New Jersey production facility, which was located in Teterboro, New Jersey at the time.

44. In connection with his employment, Tanaka expressly acknowledged and agreed to the following provisions in Sun Noodle's employee handbook:

> **Confidentiality**. All employees are required to maintain [confidential] information in strict confidence . . . No employee is authorized to copy or disclose any confidential information of the Company. Confidential information includes all recipes and formulas, all letters or any other information concerning transactions with customers, customer lists, payroll or personnel records of past or present employees, financial records of the Company, all records pertaining to purchases from vendors or suppliers, correspondence and agreements with manufacturers or distributors and documents concerning operating procedures of the Company. . . All SUN NOODLE records and

property, including client lists, expiration dates, personnel information and related information, are the sole property of SUN NOODLE and are not to be used for any other purpose other than to benefit SUN NOODLE. This information is strictly confidential and is not to be taken out of the SUN NOODLE office or discussed with anyone not affiliated with SUN NOODLE.

**Protection of Trade Secrets and Confidential Information.** As part of their employment with the Company, employees may be exposed to and/or provided with trade secrets ("Trade Secrets") and other confidential and proprietary information ("Confidential Information") of the Company relating to the operation of the Company's business and its customers . . . The Company's Trade Secrets are (1) not generally known to the public or to the Company's competitors; (2) were developed or compiled at significant expense by the Company over an extended period of time; and (3) are the subject of the Company's reasonable efforts to maintain their secrecy . . . As part of the consideration employees provide to the Company in exchange for their employment and continued employment with the Company is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of the Company, and that if the Company's Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to the Company and would give a competing business an unfair business advantage against the Company. Employees will not, except as required in the conduct of the Company's business or as authorized in writing by the Company, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files, plans, documents and the like relating to the business of the Company which employees prepare, use or come in contact with shall be and shall remain the sole property of the Company and shall not be copied without written permission of the Company and shall be returned to the Company on termination or cessation of employment, or at the Company's request at any time.

45. As Maintenance Manager, Tanaka was responsible for, among other things: (i) overseeing production operations, maintenance, and repairs; (ii)

supervising factory workers; (iii) conducting factory inspections to ensure proper equipment operation; and (iv) overseeing stock levels and reordering where necessary.

46. Throughout Tanaka's employment, Sun Noodle paid for him to travel to Japan and Hawaii on numerous occasions to ensure that he could develop and maintain the technological expertise required for his position.

47. On or about March 31, 2025, Tanaka resigned from SNNJ.

48. Tanaka is currently employed in the role of Factory Manager at Komolo.

**D. Sato's Employment with Sun Noodle**

49. Sato joined SNNJ on or about June 18, 2018 as a custodian.

50. Like Tanaka, Sato received, acknowledged and agreed to abide by the Company's handbook, including the "Confidentiality" and "Protection of Trade Secrets and Confidential Information" provisions.

51. In recognition of his skill and dedication to the Company, Sato subsequently transitioned to Sun Noodle's Research & Development Department ("R&D") and swiftly assumed a series of escalating roles within that division. Although Sato was technically employed by SNNJ, he provided services to H&U and related H&U subsidiaries on a nationwide basis while employed in Research & Development roles.

52. Throughout his employment in R&D, Sato had both a password-protected Company-issued laptop and ongoing access to a variety of Sun Noodle's trade secrets and confidential information, including Sun Noodle's recipes stored in a restricted SharePoint folder.

53. On or about March 31, 2025, Sato—who by that time had ascended to the role of National R&D Manager—was promoted to the position of Head of Innovation and Commercialization.

54. In this role, Sato was responsible for, among other things: (i) leading strategic efforts, developments, and execution of new products; (ii) driving successful market entry and stability; (iii) improving, launching and developing Sun Noodle's products; and (iv) facilitating long-term stakeholder value.

55. Sato reported directly to Kenshiro, H&U's President, North America.

56. Sato was successful as Head of Innovation and Commercialization and was responsible for managing continual refinements to Sun Noodle's products, including its Classic Noodle recipe.

57. On or about May 3, 2026, Sun Noodle promoted Sato again, this time to the role of Director of Innovation and Commercialization. In this position, Sato performed substantially similar job duties at a higher rate of pay.

58. On July 2, 2026, Sato resigned from Sun Noodle for unspecified personal reasons.

**E. <u>Sun Noodle Learns of Tanaka's and Sato's Unlawful Conduct</u>**

59. Following Sato's resignation, Sato's incoming emails were forwarded to Kenshiro and Sun Noodle's Quality Assurance specialist Marlon Velasco ("Velasco") to ensure that they could follow up on any critical communications.

60. On July 13, 2026, Tanaka sent a file share invitation to Sato's Sun Noodle email address containing an Excel spreadsheet titled "Ramen Purchase" (the "Spreadsheet").

61. The email, like all of Sato's post-resignation work emails, was forwarded to Kenshiro and Velasco, who downloaded and opened the Spreadsheet.

62. The Spreadsheet's associated metadata reflects that Tanaka created it on April 7, 2025 (one week after resigning from Sun Noodle) and last modified it on July 13, 2026, the same day he sent it to Sato.

63. Upon reviewing the Spreadsheet, Kenshiro was shocked to discover that it was replete with Sun Noodle's trade secrets and confidential and proprietary information, including information *post-dating* Tanaka's employment with Sun Noodle that he presumably only could have received from Sato.

64. The Spreadsheet, divided into five tabs, contains: (a) a production log similar to the type of log used by Sun Noodle—distributed and completed daily in Sun Noodle's production facilities—along with basic ingredient ratios and noodle machine settings to create batches of noodles; (b) Sun Noodle's confidential Classic

Noodle recipe; (c) Sun Noodle's confidential customer list for its noodle products; (d) a list of equipment and production materials necessary to supply and operate a food safety facility; and (e) a schematic of a noodle production floor, including a design for a conveyor belt for noodle transportation.

65. The Classic Noodle recipe contained in the Spreadsheet includes: (a) an incremental ingredient portion size to generate batches of noodles based on mixer size, up to one ton; (b) the portions included in the cases, sleeves and boxes that the Company packs with its noodles to sell to customers; (c) various noodle recipe combinations; and (d) a separate iteration of the Classic Noodle recipe specifying the type of flour used by Sun Noodle, with ratios to create full and half batches of noodles.

66. The Classic Noodle recipe contained in the Spreadsheet references the Company's use of a specific type of flour, which Sun Noodle *did not* use in its Classic Noodle recipe until 2026.

67. Tanaka, who left Sun Noodle in March 2025, could not have known to include the specific type of flour in the Spreadsheet unless he had been provided with this information from someone employed at the Company far more recently, like Sato.

68. The Spreadsheet constitutes an invaluable and painfully clear "playbook" of precisely how to compete with Sun Noodle and provides Komolo a

complete list of everything Komolo could possibly require to begin its own noodle manufacturing and sale operation, from the trash cans to stock in the test kitchen to Sun Noodle's secret Classic Noodle recipe, to the customers that Komolo could usurp.

69. Armed with the Spreadsheet and two former Sun Noodle employees with the most intimate knowledge of the Company's inner workings, Komolo and its parent company TBK are prepared to stand on the back of Sun Noodle's generations of hard work to eliminate Komolo's role as the "middleman" and hijack the Company's role in a small and highly competitive market.

70. Following this revelation, Sun Noodle employed its Information Technology department to conduct a forensic investigation into Sato's access and use of Sun Noodle's recipe information.

71. The forensic investigation revealed that on Saturday, May 9, 2026, Sato accessed Sun Noodle's restricted recipe SharePoint folder and downloaded no less than *313 individual files* to his personal Dell laptop. At least seven of the 313 downloaded files contained or referenced the Company's Classic Noodle recipe.

72. Notably, Sato was in possession of a Company-issued laptop at the time, and thus had no need to download any files to his personal laptop.

73. This download was a direct violation of Sun Noodle's "Confidentiality" and "Protection of Trade Secrets and Confidential Information" policies, which Sato acknowledged and agreed to abide by in connection with his employment.

### F. <u>Sun Noodle Demands that Defendants Cease Any Use of Sun Noodle's Trade Secret and Confidential Information</u>

74. On July 16, 2026, after learning of Defendants' misconduct, Sun Noodle's counsel immediately sent cease and desist letters to Komolo, Tanaka, and Sato.

75. Sun Noodle asked Komolo to: (i) instruct its employees to cease and desist from using, disclosing, transmitting, or otherwise making available any of Sun Noodle's trade secrets and confidential information; (ii) ensure that none of Sun Noodle's trade secrets and confidential information were used in any of Komolo's business operations; (iii) preserve and return Sun Noodle's trade secrets and confidential information; and (iv) provide written assurances of compliance with each of the foregoing demands within seven business days.

76. Likewise, Sun Noodle asked Sato and Tanaka to: (i) cease and desist from using, disclosing, transmitting, or otherwise making available any of Sun Noodle's trade secrets and confidential information; (ii) confirm that they had not used, disclosed, transmitted or otherwise made Sun Noodle's trade secrets and confidential information available to others; and (iii) confirm the foregoing in writing within seven business days.

77. On July 22, 2026, counsel for Sun Noodle held a telephonic meet and confer with Christopher Carcich ("Mr. Carcich"), counsel for Komolo, Tanaka, and Sato.

78. On that call, Mr. Carcich confirmed that Sato was, or would soon be, employed by Komolo, confirmed that Tanaka indeed had possession of the Spreadsheet, and confirmed that the "Ramen Purchase" spreadsheet contained Sun Noodle's confidential information.

79. On August 6, 2026, counsel for Sun Noodle again conferred with Mr. Carcich via telephone, and informed him that the Company intended to pursue legal action if a resolution could not be reached.

80. Again, Mr. Carcich could not confirm any of the information requested by Sun Noodle, and had no new information other than sharing that the Spreadsheet contained a Komolo noodle recipe for "Shinari Noodle" alongside the Company's Classic Noodle recipe, clearly demonstrating Komolo's intent to compete in the craft noodle field armed with Sun Noodle's trade secrets and confidential information.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS**
**UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *et seq.***
**(Against All Defendants )**

81. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 80 as if fully set forth herein.

82. The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

83. Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

84. Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew

or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

85. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

86. Certain confidential and proprietary information of Sun Noodle constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce, including the Classic Noodle recipe and Sun Noodle's customer list.

87. Sun Noodle derives independent economic value from the fact that its Classic Noodle recipe is not generally known to individuals or entities outside of

Sun Noodle. As a result of the time, research, and expense devoted to creating and refining the Classic Noodle recipe, and maintaining a secrecy over the recipe, Sun Noodle has developed a superior ramen product to that of its competitors that is preferred by restaurants and wholesale food distributors, as evidenced by Sun Noodle's market share in the ramen distribution industry.

88. Sun Noodle also derives independent economic value by maintaining the secrecy of its customer lists.

89. Sun Noodle takes reasonable measures to protect the secrecy of its recipe information, including the Classic Noodle recipe. These measures include: storing the Classic Noodle recipe in a Company-secured SharePoint database to which only key personnel have access; requiring employees to access the SharePoint database through password-protected laptops or by using multi-factor authentication; and requiring every employee to review and agree to comply with the policies set forth in its Employee Handbook, which contains restrictions on the use, disclosure, and misappropriation of Sun Noodle's trade secret and confidential information, including the Classic Noodle recipe.

90. Sun Noodle also takes reasonable measures to protect the secrecy of its customer lists. These measures include: storing customer lists in a Company-secured ERP database to which only key personnel have access; requiring employees to access the ERP database through password-protected laptops or by using multi-

factor authentication; and requiring every employee to review and agree to comply with the policies set forth in its Employee Handbook, which contains restrictions on the use, disclosure, and misappropriation of Sun Noodle's trade secret and confidential information, including its customer lists.

91. Tanaka and Sato had a duty to maintain the secrecy of Sun Noodle's Classic Noodle recipe and customer lists, in part, based on their execution of the Employee Handbook in which they acknowledged that they would not disclose any of Sun Noodle's confidential information, including Sun Noodle's recipe information and customer lists.

92. Tanaka and Sato acquired Sun Noodle's trade secrets, including the Classic Noodle recipe and Sun Noodle's customer list, without consent of any kind for their own benefit, and the benefit of Komolo and TBK, through their own independent conduct.

93. Upon information and belief, Tanaka and Sato have misappropriated and disclosed, and will continue to disclose and utilize Sun Noodle's trade secrets in the course of their employment with Komolo by using this information to develop and manufacture a ramen recipe to unfairly compete with Sun Noodle.

94. Sun Noodle has suffered and will continue to suffer damages and irreparable harm as a result of Defendants' violations of the DTSA, including loss

of customers and revenue, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

95. Sun Noodle is entitled to actual damages from Defendants and attorneys' fees.

96. Sun Noodle cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

97. Defendants' actions will continue to cause irreparable harm and damages to Sun Noodle and its trade secret information if not restrained.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS**
**UNDER NEW JERSEY TRADE SECRETS ACT N.J.S.A. 56:15-1, *et seq.***
**(Against All Defendants )**

98. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 97 as if fully set forth herein.

99. The New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, *et seq*. ("NJTSA") forbids the misappropriation of trade secrets. Under the NJTSA, a trade secret means "information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is

the subject of efforts that are reasonable under the circumstances to maintain secrecy." N.J.S.A. § 56:15-2.

100. Under the NJTSA, misappropriation means "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who: (a) used improper means to acquire knowledge of the trade secret; or (b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means; or (c) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means." N.J.S.A. § 56:15-2.

101. The NJTSA defines improper means as "the theft, bribery, misrepresentation, breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, a trade secret, or espionage through electronic or other means, access that is unauthorized or exceeds the scope of authorization, or other means that violate a person's rights under the laws of this State." N.J.S.A. § 56:15-2.

102. Sun Noodle derives independent economic value from the fact that its Classic Noodle recipe is not generally known to individuals or entities outside of Sun Noodle. As a result of the time, research, and expense devoted to creating and

refining the Classic Noodle recipe, and maintaining a secrecy over the recipe, Sun Noodle has developed a superior ramen product to that of its competitors that is preferred by restaurants and wholesale food distributors, as evidenced by Sun Noodle's market share in the ramen distribution industry.

103. Sun Noodle also derives independent economic value by maintaining the secrecy of its customer lists.

104. Sun Noodle takes reasonable measures to protect the secrecy of its recipe information, including the Classic Noodle recipe. These measures include: storing the Classic Noodle recipe in a Company-secured SharePoint database to which only key personnel have access; requiring employees to access the SharePoint database through password-protected laptops or by using multi-factor authentication; and requiring every employee to review and agree to comply with the policies set forth in its Employee Handbook, which contains restrictions on the use, disclosure, and misappropriation of Sun Noodle's trade secret and confidential information, including the Classic Noodle recipe.

105. Sun Noodle also takes reasonable measures to protect the secrecy of its customer lists. These measures include: storing customer lists in a Company-secured ERP database to which only key personnel have access; requiring employees to access the ERP database through password-protected laptops or by using multi-factor authentication; and requiring every employee to review and agree to comply

with the policies set forth in its Employee Handbook, which contains restrictions on the use, disclosure, and misappropriation of Sun Noodle's trade secret and confidential information, including its customer lists.

106. Tanaka and Sato had a duty to maintain the secrecy of Sun Noodle's Classic Noodle recipe and customer lists, in part, based on their execution of the Employee Handbook in which they acknowledged that they would not disclose any of Sun Noodle's confidential information, including Sun Noodle's recipe information and customer lists.

107. Tanaka and Sato acquired Sun Noodle's trade secrets without consent of any kind for their own benefit and the benefit of Komolo through their own independent conduct and/or at the direction of Komolo and/or TBK.

108. Upon information and belief, Tanaka and Sato have misappropriated and disclosed, and will continue to disclose and utilize Sun Noodle's trade secrets in the course of their employment with Komolo by using this information to develop an identical ramen recipe to unfairly compete with Sun Noodle.

109. Sun Noodle has suffered and will continue to suffer damages and irreparable harm as a result of Defendants' violation of the NJTSA, including loss of customers and revenue, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

110. Sun Noodle is entitled to actual damages from Defendants and attorneys' fees.

111. Sun Noodle cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

112. Defendants' actions will continue to cause irreparable harm and damages to Sun Noodle and its trade secret information if not restrained.

**COUNT III**
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**
**(Against All Defendants)**

113. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 112 as if fully set forth herein.

114. Through their employment with Sun Noodle, Tanaka and Sato received access to Sun Noodle's confidential and proprietary information, including Sun Noodle's Classic Noodle recipe and customer lists.

115. Sun Noodle's confidential and proprietary information, including its Classic Noodle recipe and customer lists, is not known to the public and Tanaka and Sato would not have been aware of such information if not for their employment with Sun Noodle.

116. Tanaka and Sato knew that Sun Noodle considers all recipe information and customer lists to be Sun Noodle's confidential information based on their acknowledgment of the Employee Handbook, which states that "[n]o employee is

authorized to copy or disclose any confidential information . . . includ[ing] all recipes and formulas [and] customer lists" and that Sun Noodle's confidentiality policy is meant to safeguard Sun Noodle's confidential information from competitors.

117. Sun Noodle derives independent economic value from the fact that its Classic Noodle recipe is not generally known to individuals or entities outside of Sun Noodle. As a result of the time, research, and expense devoted to creating and refining the Classic Noodle recipe, and maintaining a secrecy over the recipe, Sun Noodle has developed a superior ramen product to that of its competitors that is preferred by restaurants and wholesale food distributors, as evidenced by Sun Noodle's market share in the ramen distribution industry.

118. Sun Noodle also derives independent economic value by maintaining the secrecy of its customer lists.

119. Tanaka misappropriated Sun Noodle's confidential information, including the Classic Noodle recipe and Sun Noodle's customer information, by maintaining and disclosing the Classic Noodle recipe and customer information after his termination of employment from Sun Noodle. Upon information and belief Tanaka misappropriated Sun Noodle's confidential information, by maintaining and disclosing the recipe to Komolo, a direct competitor of Sun Noodle.

120. Upon information and belief, Sato misappropriated Sun Noodle's confidential information by disclosing Sun Noodle's recipe information to Tanaka after Tanaka departed Sun Noodle to work for Defendant Komolo.

121. Upon information and belief, Komolo and TBK misappropriated Sun Noodle's recipe information by receiving the information from Tanaka and Sato with knowledge that the recipe information came from Sun Noodle.

122. Upon information and belief, Tanaka and Sato have and will continue to disclose and utilize Sun Noodle's confidential information in the course of their employment with Komolo by using this information to develop an identical ramen recipe to unfairly compete with Sun Noodle.

123. Sun Noodle has suffered and will continue to suffer damages and irreparable harm as a result of Defendants' misappropriation of confidential information, including loss of customers and revenue, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

124. Sun Noodle is entitled to actual damages from Defendants and attorneys' fees.

125. Sun Noodle cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

126. Defendants' actions will continue to cause irreparable harm and damages to Sun Noodle and its confidential information if not restrained.

**COUNT IV**
**UNFAIR COMPETITION**
**(Against All Defendants)**

127. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 126 as if fully set forth herein.

128. Through their employment with Sun Noodle, Tanaka and Sato received access to Sun Noodle's confidential and proprietary information, including Sun Noodle's recipe information.

129. Sun Noodle's confidential and proprietary information, including its Classic Noodle recipe and customer lists, is not known to the public and Tanaka and Sato would not have been aware of such information if not for their employment with Sun Noodle.

130. Tanaka and Sato knew that Sun Noodle considers all recipe information to be Sun Noodle's confidential information based on their acknowledgment of the Employee Handbook, which states that "[n]o employee is authorized to copy or disclose any confidential information . . . includ[ing] all recipes and formulas [and] customer lists" and that Sun Noodle's confidentiality policy is meant to safeguard Sun Noodle's confidential information from competitors.

131. Sun Noodle derives independent economic value from the fact that its Classic Noodle recipe is not generally known to individuals or entities outside of Sun Noodle. As a result of the time, research, and expense devoted to creating and

refining the Classic Noodle recipe, and maintaining a secrecy over the recipe, Sun Noodle has developed a superior ramen product to that of its competitors that is preferred by restaurants and wholesale food distributors, as evidenced by Sun Noodle's market share in the ramen distribution industry.

132. Sun Noodle also derives independent economic value by maintaining the secrecy of its customer lists.

133. Tanaka misappropriated Sun Noodle's confidential information, including its Classic Noodle recipe and Sun Noodle's customer information, by maintaining and disclosing the Classic Noodle recipe and Sun Noodle's customer information after his termination of employment from Sun Noodle. Upon information and belief, Tanaka misappropriated Sun Noodle's confidential information, by maintaining and disclosing the recipe to Komolo to assist Komolo and TBK in developing a ramen recipe to compete with Sun Noodle.

134. Upon information and belief, Sato misappropriated Sun Noodle's confidential information by disclosing Sun Noodle's recipe information to Tanaka after Tanaka departed Sun Noodle to work for Komolo.

135. Upon information and belief, Tanaka and Sato have and will continue to disclose and utilize Sun Noodle's confidential information in the course of their employment with Komolo by using this information to develop an identical ramen recipe to unfairly compete with Sun Noodle.

136. Sun Noodle has suffered and will continue to suffer damages and irreparable harm as a result of Defendants' misappropriation of confidential information, including loss of customers and revenue, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

137. Sun Noodle is entitled to actual damages from Defendants and attorneys' fees.

138. Sun Noodle cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

139. Defendants' actions will continue to cause irreparable harm and damages to Sun Noodle and its confidential information if not restrained.

## COUNT V
## BREACH OF FIDUCIARY DUTY
## (Against Sato)

140. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 139 as if fully set forth herein.

141. As Head of Innovation and Commercialization at Sun Noodle, Sato owed Sun Noodle a fiduciary duty of loyalty, including a duty to act in Sun Noodle's best interests and avoid assisting Sun Noodle's competition.

142. Sato breached his fiduciary duty to Sun Noodle during his employment period by, among other things, downloading Sun Noodle's confidential files to his

personal device, misappropriating Sun Noodle's confidential information and trade secrets, and supplying this information to Tanaka, Komolo, and TBK.

143. Upon information and belief, Komolo and TBK will directly compete with Sun Noodle by developing and selling products that contain Sun Noodle's Classic Noodle recipe to customers, including Sun Noodle's existing customer base.

144. As a direct and proximate result of Sato's breach of fiduciary duty, Sun Noodle has suffered, and will continue to suffer, significant damage including but not limited to the loss of business opportunities, market presence, damages to its business reputation, lost sales, and the cost of an investigation into his unlawful conduct.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
**(Against All Defendants)**

145. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 144 as if fully set forth herein.

146. Until the events giving rise to this action, Sun Noodle had maintained valid business relationships with its customers and/or prospective customers through the sales of products which feature the Classic Noodle recipe.

147. Sun Noodle's relationships generated goodwill and an expectation for future business.

148. As the former Head of Innovation and Commercialization with Sun Noodle, Sato was aware of Sun Noodle's reasonable expectation of future business and economic benefit with its customers. In this role, Sato was responsible for, among other things, leading strategic efforts, developments, and execution of new products; driving successful market entry and stability; improving, launching and developing Sun Noodle's products; facilitating long-term stakeholder value; and market analysis related to Sun Noodle's Classic Noodle recipe.

149. As a former Maintenance Manager at Sun Noodle's New Jersey production facility, Tanaka was aware of Sun Noodle's reasonable expectation of future business and economic benefit with its customers. In this role, Tanaka was responsible for, among other things, overseeing production operations, maintenance, and repairs; supervising factory workers; conducting factory inspections to ensure proper equipment operation; and overseeing stock levels and reordering where necessary.

150. Komolo and TBK were aware of Sun Noodle's reasonable expectation of future business and economic benefit with its customers because of Komolo's and TBK's business relationships with Sun Noodle, which includes purchasing products containing Sun Noodle's Classic Noodle recipe from Sun Noodle.

151. Defendants maliciously, intentionally, and tortiously interfered with Sun Noodle's reasonable expectation of economic advantage by developing a

scheme to misappropriate Sun Noodle's confidential information and trade secrets, including but not limited to its Classic Noodle recipe and customer list, to unjustifiably interfere with Sun Noodle's business relationships.

152. But for Defendants' wrongful conduct, Sun Noodle would have continued to realize the economic benefit of its continued relationships with its customers and prospective customers.

153. As a direct and proximate result of Defendants' tortious conduct, Sun Noodle has suffered, and will continue to suffer, significant damage including but not limited to the loss of business opportunities, market presence, damages to its business reputation, lost sales, and its competitive advantage and goodwill.

**COUNT VII**
**VIOLATION OF THE NEW JERSEY COMPUTER**
**RELATED OFFENSES ACT, N.J.S.A. § 2A:38A-3**
**(Against Sato and Tanaka)**

154. Sun Noodle incorporates by reference and realleges the allegations contained in Paragraphs 1 through 153 as if fully set forth herein.

155. Sato, acting in concert with Tanaka, knowingly and without authorization took information and data from Sun Noodle's computer system and network, including Sun Noodle's recipe information, and improperly disclosed such information in violation of New Jersey Computer Related Offenses Act, N.J.S.A. § 2A:38A-3.

156. As a result of Sato's and Tanaka's unauthorized access and taking, Sun Noodle has been and will continue to be harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Sun Noodle prays for judgment against Defendants as follows:

A. Entry of a Temporary Restraining Order and Preliminary and Permanent Injunction against Defendants prohibiting the use, disclosure, or further dissemination of Sun Noodle's trade secret and confidential information;

B. Actual, compensatory and exemplary damages to be determined at trial;

C. An award to Sun Noodle of all costs, litigation expenses, and reasonable attorneys' fees incurred by Sun Noodle;

D. Such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Sun Noodle hereby demands a trial by jury on all issues so triable of right.

Dated: August 17, 2026

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

*/s/ Sean J. Kirby*
Sean J. Kirby (N.J. Bar No. 27782006)
Lindsay Colvin Stone (*pro hac vice* forthcoming)
Ian Wahrenbrock (*pro hac vice* forthcoming)
Matthew Netti (*pro hac vice* forthcoming)
30 Rockefeller Plaza
New York, New York 10112
Telephone: 212-653-8700
Facsimile: 212-653-8701
skirby@sheppard.com
lstone@sheppard.com
iwahrenbrock@sheppard.com
mnetti@sheppard.com

*Attorneys for Plaintiffs H&U, Inc. dba Sun Noodle and Sun Noodle New Jersey, LLC*

**CERTIFICATION PURSUANT TO LOCAL RULE 11.2**

I certify that the matter in controversy is not subject of any other action in any Court, or of any pending arbitration or administrative proceeding.

Dated: August 17, 2026

*/s/ Sean J. Kirby*
Sean J. Kirby

**VERIFICATION**

I, Kenshiro Uki, verify that I am President of Sun Noodle, LLC, the Plaintiff in this proceeding, and that the facts set forth in the Verified Complaint are true and correct to the best of mu knowledge, information, and belief. I understand that false statements herein are subject to penalties of 28 U.S.C. § 1746 relating to sworn declarations.

Dated: August 17, 2026

Kenshiro Uki
President, North America
H&U, Inc. dba Sun Noodle