**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| H&U, INC. d/b/a SUN NOODLE and SUN NOODLE NEW JERSEY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>KOMOLO INC., *et al*.,<br><br>Defendants. | Civil Action No. 26-10454 (JXN)(JBC)<br><br>**OPINION** |

**NEALS**, District Judge

This trade secrets case is about noodles. Plaintiff H&U, Inc. d/b/a Sun Noodle ("Sun Noodle") makes and sells Japanese noodles. Defendant Komolo, Inc. ("Komolo") buys and sells food, including noodles. Komolo is set to open its own noodle-making factory in late September 2026. Sun Noodle claims two former employees, Defendants Yasuhisa Tanaka ("Tanaka") and Makoto Sato ("Sato"), took Sun Noodle's secret recipes, customer lists, and factory specifications, and then left to work for Komolo.

Sun Noodle and Sun Noodle New Jersey ("SNNJ") (collectively, "Plaintiffs"), sued Komolo, TBK Holdings ("TBK"), Tanaka, and Sato (collectively, "Defendants") for misappropriating trade secrets, unfair competition, and tortious interference. (ECF No. 1.) Plaintiffs moved for a temporary restraining order ("TRO") to prevent Defendants from using Sun Noodle's trade secrets; and for expedited discovery. (ECF No. 4.) Defendants opposed. (ECF No. 19.) The Court orally granted Plaintiffs' TRO and expedited discovery motion at an August 27,

2026 hearing and entered a written Order to the same effect the next day.[1] (ECF No. 26.) This Opinion memorializes the reasons for the Court's decision.

## I. <u>BACKGROUND</u>[2]

### A. Sun Noodle Makes Noodles

Sun Noodle makes and sells Japanese noodles to restaurants and supermarkets. (Compl. ¶¶ 19–24, ECF No. 1.) According to Sun Noodle, it is the "market share leader" in the "small and highly competitive craft ramen sector." (*Id.* ¶ 25.) SNNJ is a subsidiary of Sun Noodle. (*Id.* ¶ 14.)

Sun Noodle spent decades developing secret noodle recipes. (*Id.* ¶ 27.) Those recipes are "proprietary, fiercely guarded, and stored only in a Company-secured and password protected SharePoint database." (*Id.* ¶ 28.) Only a few Sun Noodle employees have access to the SharePoint folder containing the secret recipes. (*Id.* ¶ 29.) Those employees "may only access the recipe information through their password protected, Company-issued laptops or on their personal devices, which require an employee to use their Company credentials (username and password) through Microsoft 365, and complete a two-factor authentication system." (*Id.* ¶ 31.)

Sun Noodle also keeps its confidential customer lists in a secured system available only to certain employees. (*Id.* ¶ 33.) And, like the secret recipes, authorized employees may only access the customer lists "through their password protected, Company issued laptops or on their personal devices, which require an employee to use their Company credentials (username and password) through Microsoft 365, and complete a two-factor authentication system." (*Id.* ¶ 35.)

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

[2] The Court derives the following facts from the Complaint (Compl., ECF No. 1), and Dong Han's declaration, submitted in opposition to the motion. (Han Decl., ECF No. 19-1). The Court notes Plaintiffs have since filed an Amended Complaint. (*See* Am. Compl., ECF No. 27.) Because this Opinion memorializes the Court's decision, which it made based on the allegations in the Complaint, the Court does not reference the Amended Complaint.

**B. Komolo Buys, Sells, and Plans to Make Noodles**

Komolo buys and sells food products, including noodles. (*Id.* ¶ 37.) Komolo started purchasing noodles from Sun Noodle in 2017. (*Id.* ¶ 39.) Plaintiffs claim Komolo bought over $1 million in Sun Noodles between 2017 and 2026. (*Id.* ¶ 41.)

Komolo has some additional involvement in the noodle business, though the parties disagree on the details. According to Plaintiffs, Komolo's owner, TBK, operates, among other things, a ramen franchise ("RamenYa"). (*Id.* ¶¶ 16, 39.) And Plaintiffs claim Komolo is "planning to manufacture its own noodles." (*Id.* ¶ 42.)

Defendants, meanwhile, assert TBK does not exist. (Han Decl. ¶ 2 n.1, ECF No. 19-1.) Rather, Komolo's sister company, Pora Food LLC ("Pora") owns RamenYa. (*Id.* ¶ 9.) As RamenYa expanded, Komolo bought noodles from Sun Noodle to meet demand. (*Id.* ¶ 14.) But, as demand kept growing, Komolo developed plans to build its own noodle factory. (*Id.* ¶ 16.) According to Defendants, Komolo's noodle-making factory passed inspection on August 12, 2026, and is expected to begin production in late September 2026. (*Id.* ¶ 23.)

**C. Tanaka Worked for SNNJ From 2017 to 2025**

Tanaka started working for SSNJ in February 2017, as a Maintenance Manager. (Compl. ¶¶ 17, 43.) He "(i) overs[aw] production operations, maintenance, and repairs; (ii) supervis[ed] factory workers; (iii) conduct[ed] factory inspections to ensure proper equipment operation; and (iv) overs[aw] stock levels and reorder[ed] where necessary." (*Id.* ¶ 45.)

Tanaka's signed employment agreement includes confidentiality, trade secret, and arbitration provisions. (*Id.* ¶ 44.) The confidentiality provision designates as confidential "all recipes and formulas, all . . . information concerning transactions with customers, customer lists, . . . financial records of the Company, all records pertaining to purchases from vendors or suppliers,

correspondence and agreements with manufacturers or distributors and documents concerning operating procedures of the Company." (*Id.*) The trade secret provision prohibits employees from copying any confidential information "without written permission of the Company and shall be returned to the Company on termination or cessation of employment, or at the Company's request at any time." (*Id.*) The arbitration provision covers "all disputes that may arise out of or be related in any way to [Tanaka's] employment, including but not limited to the termination of [his] employment and [his] compensation." (*See* Pls.' Ex. H, ECF No. 4-11.)

Tanaka left Sun Noodle in March 2025 to work for Komolo as a Factory Manager. (Compl. ¶ 48.)

**D. Sato Worked for Sun Noodle Between 2018 and 2026**

Sato started working for Sun Noodle in June 2018 as a custodian. (*Id.* ¶ 49.) His signed employment agreement contained the same confidentiality, trade secrets, and arbitration provisions as Tanaka's. (*See id.* ¶ 50; Pls.' Ex. I, ECF No. 4-12.)

Sato rapidly rose through Sun Noodle. First, he transferred to Sun Noodle's Research and Development ("R&D") department. (Compl. ¶ 51.) Then he became a National R&D Manager. (*Id.* ¶ 53.) And in March 2025, he was promoted to Head of Innovation and Commercialization. (*Id.*) Sato was responsible for "(i) leading strategic efforts, developments, and execution of new products; (ii) driving successful market entry and stability; (iii) improving, launching and developing Sun Noodle's products; and (iv) facilitating long-term stakeholder value." (*Id.* ¶ 54.) Throughout his employment, Sato had a company-issued computer with access to Sun Noodle's secret recipes and customer lists. (*Id.* ¶ 52.)

In May 2026, Sun Noodle promoted Sato to Director of Innovation and Commercialization. (*Id.* ¶ 57.) Two months later, Sato resigned from Sun Noodle. (*Id.* ¶ 58.)

### E. Tanaka Emails Trade Secrets to Sato

Shortly after Sato resigned, Tanaka sent an email to Sato's Sun Noodle address. (*Id.* ¶ 60.) Tanaka's email contained an Excel spreadsheet ("Spreadsheet") titled "Ramen Purchase." (*Id.*) The Spreadsheet, which Tanaka created after leaving Sun Noodle, "was replete with Sun Noodle's trade secrets and confidential and proprietary information." (*Id.* ¶¶ 62–63.) Specifically, the Spreadsheet includes:

> (a) a production log similar to the type of log used by Sun Noodle—distributed and completed daily in Sun Noodle's production facilities—along with basic ingredient ratios and noodle machine settings to create batches of noodles; (b) Sun Noodle's confidential Classic Noodle recipe; (c) Sun Noodle's confidential customer list for its noodle products; (d) a list of equipment and production materials necessary to supply and operate a food safety facility; and (e) a schematic of a noodle production floor, including a design for a conveyor belt for noodle transportation.

(*Id.* ¶ 64; *see also* ECF No. 5 ("Spreadsheet").) Notably, the secret recipe in the Spreadsheet references a type of flour Sun Noodle did not begin using until 2026—after Tanaka left. (Compl. ¶ 66.)

### F. Sun Noodle Learns Sato Downloaded Secrets to his Personal Computer

After reviewing the Spreadsheet, Sun Noodle investigated Sato's access to company secrets. (*Id.* ¶ 70.) A forensic investigation revealed that, shortly after his May 2026 promotion, Sato "accessed Sun Noodle's restricted recipe SharePoint folder and downloaded no less than 313 individual files to his personal Dell laptop. At least seven of the 313 downloaded files contained or referenced the Company's Classic Noodle recipe." (*Id.* ¶ 71.)

### G. Sun Noodle Demands Defendants Cease and Desist

Three days after receiving the Spreadsheet, Sun Noodle sent cease and desist letters to Defendants. (*Id.* ¶ 74.) Following conversations between the parties, Defendants' counsel

confirmed (1) Komolo imminently planned to hire Sato; (2) Tanaka had the Spreadsheet; and (3) the Spreadsheet contained Sun Noodle's confidential information. (*Id.* ¶ 78.)

**H. Sun Noodle Sues Defendants and Seeks a TRO, Which the Court Grants**

Plaintiffs filed this action on August 17, 2026. (*See generally id.*) The Verified Complaint includes claims for (1) misappropriation of trade secrets, in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.* ("Count I"); (2) misappropriation of trade secrets, in violation of the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, *et seq.* ("Count II"); (3) misappropriation of confidential information ("Count III"); (4) unfair competition ("Count IV"); (5) breach of fiduciary duty against Sato ("Count V"); (6) tortious interference with prospective economic advantage ("Count VI"); and (7) violation of the New Jersey Computer Related Offenses Act ("NJCROA"), N.J.S.A. 2A:38A-3, against Tanaka and Sato ("Count VII"). Plaintiffs moved for a TRO to enjoin Defendants from using, disclosing, sending, or distributing Sun Noodle's trade secrets, and to compel Defendants to return or destroy those trade secrets. (*See* TRO Mot., ECF No. 4.) Plaintiffs also seek expedited discovery. (*See id.*) Defendants opposed. (*See* Defs.' Opp'n, ECF No. 19.)

This Court granted the motion on the record following oral argument on August 27, 2026. (*See* Order, ECF No. 26.) The Court entered a written Order to the same effect the next day. (*Id.*)

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 65 governs TROs and preliminary injunctions. The Court may issue a TRO when "there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a)." *Int'l Foodsource, LLC v. Grower Direct Nut Co.*, No. 16-3140, 2016 WL 4150748, at *6 (D.N.J. Aug. 3, 2016).

Courts apply the same standard to preliminary injunctions and TROs. *See Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689, 693 (3d Cir. 1997). The Court may grant a TRO only if the moving party shows (1) "a likelihood of success on the merits," and (2) "that 'it is more likely than not to suffer irreparable harm in the absence of preliminary relief.'" *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If the moving party meets these threshold requirements, the Court considers (3) "whether granting relief will result in even greater harm to the nonmoving party or other interested persons," and (4) "whether the public interest favors such relief." *Id.* The Court then "determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

## III. DISCUSSION

### A. Plaintiffs are Likely to Succeed on Their Trade Secrets Claims

A likelihood of success on the merits requires the moving party to show "a reasonable chance, or probability, of winning." *Lacayo*, 16 F.4th at 380 (quoting *In re Revel AC*, 802 F.3d 558, 568 (3d Cir. 2015)). "That does not require a 'more-likely-than-not showing of success on the merits.' But it does require the plaintiff to 'demonstrate that it *can* win on the merits,' which involves a showing that its chances of establishing each of the elements of the claim are 'significantly better than negligible.'" *Id.* (quoting *In re Revel AC*, 802 F.3d at 568–69).

Here, Plaintiffs are likely to prevail on their DTSA and NJTSA claims. DTSA provides a cause of action for "[a]n owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). A DTSA plaintiff must demonstrate (1) the existence of a trade secret, (2) the trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce"; and (3) "the misappropriation of that trade secret, defined broadly as the knowing improper acquisition,

or use or disclosure of the secret." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). The NJTSA is "virtually identical" to the DTSA. *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 355 (D.N.J. 2019).

***i. Existence of Trade Secrets***

A trade secret is information (1) "the owner thereof has taken reasonable measures to keep . . . secret" and (2) "derives independent economic value . . . from not being generally known." 18 U.S.C. § 1839(3); *see also Lacayo*, 16 F.4th at 380–81. A DTSA plaintiff "must sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such." *Thanoo*, 999 F.3d at 905.

Sun Noodle sufficiently alleges that its recipes and client lists are trade secrets. Sun Noodle took extensive measures to keep its recipes and client lists secret, placing that information in secure databases available only to a few employees. And both the recipes and client lists have independent economic value in not being generally known. Sun Noodle spent decades refining its noodle recipe, which it claims gives an edge in the competitive craft ramen market. If another company could make Sun Noodles, then Sun Noodle would not exist. Likewise, client lists are protectible trade secrets. *See Paramount Residential Mortg. Grp., Inc. v. Nationwide Mortg. Bankers, Inc.*, No. 22-4656, 2023 WL 3736385, at *5 (D.N.J. May 31, 2023) ("New Jersey state and federal courts have consistently held that critical business information such as client lists, sensitive and confidential customer information, . . . business data compilations, methods, techniques, and plans are protectable trade secrets.").

***ii. Interstate Commerce***

Sun Noodle uses its recipes and customer lists to make and sell noodles to a national market.

### ***iii. Misappropriation***

A DTSA plaintiff can establish misappropriation through "improper acquisition, disclosure, or use of a trade secret without consent." *Thanoo*, 999 F.3d at 907–08 (citing 18 U.S.C. § 1839(5)). Improper acquisition occurs when the person who acquires a trade secret "knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). And under New Jersey law, "an employer need not establish that its former employee has actually used or disclosed trade secrets. Rather, an employer may demonstrate that there is a sufficient likelihood of inevitable disclosure of its trade secrets to a competitor." *Acteon, Inc. v. Harms*, No. 20-14851, 2020 WL 6694411, at *9 (D.N.J. Nov. 6, 2020) (quoting *Corp. Synergies Grp., LLC v. Andrews*, No. 18-13381, 2019 WL 3780098, at *7 n.10 (D.N.J. 2019)).

Sato improperly acquired Sun Noodle's trade secrets. His employment agreement prohibited him from copying any confidential information without permission, which is exactly what Sun Noodle sufficiently alleges he did in duplicating Sun Noodle's recipes and customer lists to his personal computer. Tanaka also improperly acquired Sun Noodle's trade secrets. He (1) acquired Sun Noodle's trade secrets after no longer working for Sun Noodle, and (2) should have known those trade secrets were acquired improperly. Further, Plaintiffs allege that Tanaka and Sato either have disclosed or will disclose those secrets to Komolo. Defendants do not dispute that both Tanaka and Sato misappropriated Sun Noodle trade secrets. (*See* Defs.' Opp'n.) And neither Tanaka nor Sato submitted declarations in opposition to the TRO motion. (*See generally id.*)

At most, Defendants argue the arbitration clauses in Tanaka and Sato's employment contracts render a TRO inappropriate. Those arbitration clauses are irrelevant to this motion.

Defendants only elliptically reference the arbitration provisions to illustrate a "significant possibility that this matter should be proceeding in arbitration rather than in court." (Defs.' Opp'n at 10.) Defendants, however, have not yet moved to compel arbitration. So, the issue is not before the Court.

Plaintiffs, accordingly, are likely to succeed on their trade secrets claims.[3]

**B. Plaintiffs Risk Suffering Irreparable Harm Without a TRO**

The moving party must show "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. Irreparable harm is "actual or imminent harm which cannot otherwise be compensated by money damages." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988). A finding of irreparable harm may include "loss of control of reputation, loss of trade, and loss of goodwill." *GPI, LLC v. Patriot Goose Control Inc.*, No. 23-20953, 2024 WL 1704731, at *6 (D.N.J. Apr. 18, 2024) (quoting *Richardson v. Cascade Skating Rink*, No. 19-8935, 2022 WL 833319, at *4 (D.N.J. Mar. 21, 2022)).

Plaintiffs argue Tanaka and Sato's possession of Sun Noodle's secret recipes and customer lists threaten Sun Noodle with irreparable harm. (*See* Pls.' Moving Br. at 35–36, ECF No. 4-1.) According to Plaintiffs, the information Tanaka and Sato misappropriated offer Komolo a "complete 'playbook' on how to manufacture craft ramen in competition" with Sun Noodle. (*Id.* at 35.) Plaintiffs argue the only "rational conclusion" is that Tanaka and Sato have disclosed Sun Noodle's information to Komolo, and there is a substantial likelihood Komolo will use that information to compete with Sun Noodle.

The Court agrees. "It is well-established that the potential disclosure of a plaintiff's trade secrets constitutes a potential for irreparable harm, as the value of a trade secret is lost entirely

[3] The Court, therefore, does not analyze whether Plaintiffs would succeed on the merits of their other claims.

once disclosed." *Legend Biotech USA Inc. v. Liu*, No. 23-2965, 2024 WL 919082, at *8 (D.N.J. Mar. 4, 2024). "Furthermore, courts have found that a plaintiff may suffer irreparable harm if confidential information belonging to a plaintiff is not promptly returned." *Id.* at *9. Tanaka and Sato have Sun Noodle's trade secrets. Komolo is a competitor. The potential for Tanaka and Sato to purposefully or inadvertently disclose Sun Noodle's trade secrets to Komolo creates a threat of irreparable harm.

Defendants argue Plaintiffs fail to show the threat of irreparable harm because (1) Plaintiffs have not alleged any confidential information has been exposed to third parties, (Defs.' Opp'n at 7); (2) neither Tanaka nor Sato used Sun Noodle's trade secrets to get jobs with Komolo, (*id.*); (3) neither Tanaka nor Sato are poised to use the information they acquired because they are not working to help Komolo develop noodles, (*id.* at 7–8); (4) Komolo has its own noodle recipe and has no interest in Sun Noodle's recipe, (*id.* at 8); (5) Plaintiffs have not shown any harm has occurred in the year since Tanaka started working for Komolo, (*id.*); and (6) Komolo agreed to a forensic review of relevant systems, accounts, and devices, (*id.* at 8–9).

These arguments each lack merit. To start, whether Tanaka or Sato have already revealed Sun Noodle's trade secrets is irrelevant. "The irreparable harm inquiry concerns threat of future harm, not past harm." *Autobar Sys. of N.J. v. Berg Liquor Sys., LLC*, No. 23-3790, 2025 WL 1592869, at *10 (D.N.J. June 5, 2025) (citation omitted).

Next, Komolo's assertions that (a) Tanaka and Sato are not helping Komolo develop noodles, and (b) Komolo is not interested in using Sun Noodle's recipe do not compel a different conclusion. "A party may not defeat an otherwise proper application for an injunction by merely abandoning conduct that if continued or completed would have constituted irreparable harm." *NVR, Inc. v. Davern*, No. 15-5059, 2015 WL 9450831, at *3 (D.N.J. Dec. 23, 2015). Even if the

Court were to credit these self-serving assertions, Tanaka and Sato misappropriated more than just Sun Noodle's recipes—both men took, among other things, factory blueprints and customer lists.

Finally, Komolo's willingness to cooperate in a forensic information review does not negate the threat of irreparable harm. The out-of-District case Defendants cite, *The Imagine Group, LLC v. Biscanti*, No. 25-1137, 2025 WL 2936785 (D. Del. Oct. 15, 2025), is off-point. There, an employee downloaded a proprietary consultant report before resigning and working for a competitor. *See id.* at *1. The employee, however, submitted a sworn declaration stating he was "willing to delete the [report] if and when authorized to do so by the Court or agreement of the parties." *Id.* at *4 (internal quotation marks omitted). And the competitor instructed the employee not to "use or bring with him to [the competitor] any confidential information or property that belongs to [his former employer]." *Id.* Neither Tanaka nor Sato have submitted sworn declarations to this effect, nor has Komolo certified that it instructed either man to not use or bring any confidential information.

Therefore, Plaintiffs have met their burden of showing a threat of irreparable harm.

### C. The Balance of Hardships Favors Plaintiffs

Having concluded Plaintiffs will likely succeed on the merits and suffer irreparable harm without a TRO, the Court must "balanc[e] the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Liu*, 2024 WL 919082, at *10 (quoting *Power Surv., LLC v. Premier Util. Servs., LLC*, 61 F. Supp. 3d 477, 487 (D.N.J. 2014)).

The balance of hardships favors Plaintiffs. "As discussed, the harm to Plaintiff[s] is substantial and irreparable due to the potential loss of the entire value of its trade secrets should [Tanaka or Sato] intentionally or inadvertently disclose them to [Komolo], which tips the balance

of equities in Plaintiff[s'] favor." *Id.* at *13. Defendants will suffer little, if any, harm from a TRO. Any harm Tanaka and Sato might suffer is "a predictable consequence" of willfully misappropriating Sun Noodle's trade secrets. *Jiffy Lube Int'l, Inc. v. Weiss Bros.*, 834 F. Supp. 683, 693 (D.N.J. 1993). Nor would Komolo suffer harm from surrendering information it has no right to possess.

**D. A TRO is in the Public Interest**

Finally, the public interest favors Plaintiffs. "[I]t is well-established the public interest favors the enforcement and protection of trade secrets and confidentiality agreements." *Liu*, 2024 WL 919082, at *14. And "there is a generalized public interest in 'upholding the inviolability of trade secrets and enforceability of confidentiality agreements.'" *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) (citation omitted).

Because Plaintiffs satisfy all the factors for injunctive relief, the Court **GRANTS** the motion for a TRO.

**E. Plaintiffs are Entitled to Expedited Discovery**

Rule 26(d)(1) allows the Court to order expedited discovery. "In ruling on a motion for expedited discovery, the Court should consider 'the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances.'" *Strivelli v. Doe*, No. 22-206, 2022 WL 1082638, at *2 (D.N.J. Apr. 11, 2022) (quoting *Better Packages, Inc. v. Zheng*, No. 05-4477, 2006 WL 1373055, at *3 (D.N.J. May 17, 2006)). A good cause standard generally applies to motions for expedited discovery, "whereby the [C]ourt considers the totality of the circumstances to discern whether the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* "[E]xpedited

discovery is particularly appropriate' when, as here, 'a plaintiff seeks injunctive relief.'" *Id.* (quoting *Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 344–45 (D.N.J. 2020)).

To confirm the details of Defendants' conduct, Plaintiffs seek "the following expedited discovery from Defendants: (1) the right to serve each Defendant with up to seven requests for production; (2) the right to serve each Defendant with up to five interrogatories; (3) and the right to take one deposition of each Defendant." (Pls.' Moving Br. at 39.) The Court finds that this is a reasonable request under the circumstances, particularly where Plaintiffs are entitled to a TRO. *Cf. Tracey*, 451 F. Supp. 3d at 344–45 (granting expedited discovery even where plaintiff failed to satisfy TRO standard).

The Court, therefore, **GRANTS** Plaintiffs' motion for expedited discovery.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a TRO and expedited discovery (ECF No. 4) is **GRANTED**.

**DATED: 9/8/2026**

**JULIEN XAVIER NEALS**
**United States District Judge**